UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------ x
                           :

JOSEPH P. DEBIASE, III          :             3:19 CV 68 (RMS)
                           :
V.                             :
                           :
ANDREW SAUL,              :
COMMISSIONER           :
OF SOCIAL SECURITY[1]       :            DATE: OCT. 25, 2019
                           :
------------------------------------------------------ x

### RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER, OR IN THE ALTERNATIVE, MOTION FOR REMAND FOR A HEARING, AND ON THE DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks review of a final decision by the Commissioner of Social Security ["SSA"] denying the plaintiff disability insurance benefits ["SSDI"].

I.    ADMINISTRATIVE PROCEEDINGS

On April 10, 2014, the plaintiff filed an application for SSDI, claiming that he had been disabled since November 13, 2013, due to chronic leg and foot pain, chronic neck and back pain, anxiety, depression and a learning disability. (*See* Certified Transcript of Administrative Proceedings, dated April 23, 2019 ["Tr."] 322-23, 373). The plaintiff's application was denied initially and upon reconsideration. (Tr. 174-77, 190-92). On August 10, 2016, a hearing was held before Administrative Law Judge ["ALJ"] Ronald J. Thomas, at which the plaintiff and a

---

[1] The plaintiff commenced this action against Nancy A. Berryhill, as Acting Commissioner of Social Security. (Doc. No. 1). On June 17, 2019, Andrew M. Saul became the Commissioner of Social Security. Because Nancy A. Berryhill was sued in this action only in her official capacity, Andrew M. Saul is automatically substituted for Nancy A. Berryhill as the named defendant. *See* FED. R. CIV. P. 25(d). The Clerk of the Court shall amend the caption in this case as indicated above.

vocational expert testified. (Tr. 75-107). The ALJ held a second hearing on July 25, 2017, at which the plaintiff and another vocational expert testified. (Tr. 38-74).[2] On September 27, 2017, the ALJ issued an unfavorable decision denying the plaintiff's claim for benefits. (Tr. 18-31). On September 6, 2018, the Appeals Council denied the request, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 6-12; *see* Tr. 1-5).

On January 11, 2019, the plaintiff filed his complaint in this pending action (Doc. No. 1), and on January 22, 2019, the parties consented to the jurisdiction of a United States Magistrate Judge. (Doc. No. 9). This case was transferred accordingly. On April 18, 2019, the plaintiff filed his Motion to Reverse the Decision of the Commissioner (Doc. No. 14), with a brief (Doc. No. 14-2 ["Pl.'s Mem."]), exhibits (Doc. Nos. 14-3, 14-4, 14-5, 14-6, 14-7, 14-8, 14-9, 14-10), and Statement of Material Facts (Doc. No. 14-1) in support. On July 16, 2019, the defendant filed his Motion to Affirm, with brief (Doc. No. 18-1 ["Def.'s Mem."]) and a Statement of Material Facts (Doc. No. 18-1) in support.

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 14) is *denied*, and the defendant's Motion to Affirm (Doc. No. 18) is *granted.*

II.    FACTUAL BACKGROUND

Two hearings were held in this case. The first was held on August 10, 2016, and the second, supplemental hearing, was held on July 25, 2017, because the ALJ was "able to get . . . a 2014

---

[2] On May 5, 2017, the ALJ informed the plaintiff that he secured additional evidence for the record, namely, the consultative examination from F. Scott Winstanley, Ph.D. (Tr. 418). He informed the plaintiff that he could request "a supplemental hearing at which [he] would have the opportunity to appear, testify, produce witnesses, and submit additional evidence and written or oral statements concerning the facts and law." (Tr. 418). The plaintiff requested a supplemental hearing, and it was held on July 25, 2017.

consultative exam[.]" (Tr. 40; *see* Tr. 418-19).[3] On the date of the first hearing in 2016, the plaintiff was thirty-nine years old (Tr. 78); he was forty years old at the second hearing.  (Tr. 41).  The plaintiff was single and lived alone in an apartment below his parents.  (Tr. 78, 100).  He testified that he could walk upstairs to his parents' apartment but walking up the stairs "hurt[]."  (Tr. 50).

He completed high school (Tr. 79) and last worked in October 2013 as a yard man in a scrap yard.  (Tr. 79).  Prior to working in the scrap yard, the plaintiff worked in a warehouse, disassembling oxygen tanks for re-valving. (Tr. 80). Prior to that, he worked at Industrial Wrecking where he "ran a jackhammer" for demolition work. (Tr. 80).

The plaintiff testified that he was born with a problem with his left ankle, and, as he aged, this problem made working "very difficult."  (Tr. 80; *see* Tr. 429 (October 7, 2013: "patient is concerned he is going to lose his job because his pain prevents him from working at his normal fast pace.")).  The plaintiff testified that his right leg and his back would hurt from his left ankle condition because when his "ankle does not perform properly[, he would] have a wobble and weird walk[,]" which, over time, caused pain.  (Tr. 90-91; *see* Tr. 55).   He did not take medication for his leg and ankle pain. (Tr. 82-83).  He went to a rehabilitation facility in 2014 for an addiction to pain medication, so he stopped using prescribed pain medication. (Tr. 92). Over-the-counter pain medication did not help.  (Tr. 93). He preferred "to lay down and let it get better by itself."  (Tr. 82-83).  He would lay down on a bed or recline in a chair for an hour or so with his left leg elevated. (Tr. 99).   Additionally, as the plaintiff testified, he had "severe anxiety issues" for which he would take Ativan.   (Tr. 81-82; *see* Tr. 50 (experienced "full-blown panic attacks" "maybe like twice/three times a week")).  He had attention deficient disorder, so it was difficult for him to retain information.  (Tr. 85, 53).  He testified that he could not concentrate because of his anxiety,

---

[3] *See* note 2 *supra*.

and he could not perform routine/repetitive work. (Tr. 48). By his second hearing, in July 2017, the plaintiff had been diagnosed with diabetes and prescribed Metformin. (Tr. 41). Additionally, the plaintiff testified that he had carpal tunnel in both of his hands, but it was worse in his left hand than in his right. (Tr. 48).

At his first hearing, the plaintiff testified that he did not see a doctor often because he did "not have a vehicle." (Tr. 81). He did see his therapist, Dr. Jason Kiss, "twice a month or whenever [he could] get an appointment." (Tr. 82). At his second hearing, the plaintiff testified that he had a truck. (Tr. 59). He was able to cook, clean, care for his personal hygiene, do laundry, perform yard work, grocery shop, and drive. (Tr. 86-87). His parents would help him with his outside chores and cleaning his apartment. (Tr. 100-01). He built model cars but would only work on them for one or two hours before he would get a "massive headache" and numbness in his hands. (Tr. 56-57, 94).[4]

## III.   THE ALJ'S DECISION

Following the five-step evaluation process,[5] the ALJ found that the plaintiff last met the insured status requirements through December 31, 2018 (Tr. 24), and that the plaintiff did not

---

[4] A vocational expert testified at each hearing. Their extensive testimony is addressed in Section IV. *infra*.

[5] First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79–80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

engage in substantial gainful activity since November 13, 2013, the alleged onset date. (Tr. 24, citing 20 C.F.R. § 404.1571 *et seq.*).

At step two, the ALJ found that the plaintiff had the following severe impairments: osteoarthopathy of the left foot/ankle; obesity; panic disorders; and opiate dependence. (Tr. 24, citing 20 C.F.R. § 404.1520(c)). The ALJ concluded at step three that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 24-26, citing 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). Specifically, the ALJ concluded that the claimant's impairments did not meet or medically equal Listings 1.02 (major dysfunction of a joint), or 12.06 (anxiety and obsessive-compulsive disorders) in that the plaintiff had a mild limitation in understanding, remembering or applying information, a moderate limitation in interacting with others, a mild limitation in concentrating, persisting or maintaining pace, and, a mild limitation in adapting or managing oneself. (Tr. 25-26).

The ALJ concluded that the plaintiff had the residual functional capacity ["RFC"] to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), except that he was capable of simple, routine, repetitive work tasks that did not require teamwork, working closely with the public, climbing of ropes, ladders or scaffolds, or left foot controls, but did involve occasional interaction with the public, co-workers, or supervisors, occasional bending, balancing, twisting, squatting, kneeling, crawling, and climbing. (Tr. 26-27). At step four, the ALJ concluded that the plaintiff was unable to perform any of his past relevant work (Tr. 29, citing 20 C.F.R. § 404.1565), but he retained the RFC to perform other work. (Tr. 30, citing 20 C.F.R. §§ 404.1569 and 404.1569(a)). The ALJ considered the vocational expert's testimony that a person with the RFC adopted by the ALJ could have performed the work of a "monitor[,]" "document preparer[,]" and

"addresser." (Tr. 30). Accordingly, the ALJ concluded that the plaintiff was not under a disability at any time from November 13, 2013, through the date of his decision. (Tr. 31, citing 20 C.F.R. § 404.1520(g)).

IV.   STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (citation & internal quotation marks omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). "The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact." *Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citing *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might

have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

## V.     DISCUSSION

As an initial matter, the plaintiff argues that the ALJ was not properly appointed and lacked authority to hear and decide this claim. (Pl.'s Mem. at 20-23).  The plaintiff also claims that the administrative record was not developed as the ALJ "took no steps whatsoever to obtain medical source statements from Dr. [Jason] Kiss and/or Dr. [Shyla] Muriel detailing on a function-by-function basis exactly what [the plaintiff] could and could not do."  (Pl.'s Mem. at 1-3). Specifically, the plaintiff contends that the treatment records do not evidence the effects that the plaintiff's multiple conditions had on his function-by-function abilities. (Pl.'s Mem. at 6). In addition, he maintains that there are no contemporaneous treatment records from Griffin Faculty Practice prior to January 15, 2017 and no records relating to the plaintiff's regular treatment sessions with Dr. Kiss.  (Pl.'s Mem. at 6). The plaintiff argues also that his claims of pain were not considered in a "meaningful manner."  (Pl.'s Mem. at 18-19).  Finally, the plaintiff argues that the ALJ erred at step five. (Pl.'s Mem. at 10-18).

### A.     ALJ'S AUTHORITY TO PRESIDE OVER THIS CASE

The plaintiff seeks a remand of this case under *Lucia v. Securities and Exchange Commission*, 138 S. Ct. 2044 (2018), on the ground that the ALJ was an inferior officer who was not properly appointed under the United States Constitution's Appointments Clause at the time of the hearing, and thus, did not have the legal authority to preside over this matter or to issue a decision.  (Pl.'s Mem. at 20-23).

In *Lucia*, which was decided on June 21, 2018, the United States Supreme Court ["Supreme Court"] held that a "timely challenge" may be made to the "constitutional validity" of the

appointment of an officer during the administrative process. *See Lucia*, 138 S. Ct. at 2055. The Court explained that the remedy for a *timely* challenge to the constitutional validity of the appointment of an ALJ who adjudicates a case is a "new 'hearing before a properly appointed' official." *Id.* (quoting *Ryder v. United States*, 515 U.S. 177, 182-83 (1995)). The rehearing must be heard by a new, "properly appointed" ALJ. *Id.*

On July 10, 2018, the President of the United States issued an Executive Order stating that: "perhaps all—ALJs are 'Officers of the United States' and thus subject to the Constitution's Appointments Clause, which governs who may appoint such officials." Exec. Order No. 13843, 83 Fed. Reg. 32755 (July 10, 2018). On July 16, 2018, the Acting Commissioner of Social Security ratified the appointments of all SSA ALJs and approved those appointments as her own, thereby remedying the issue identified in *Lucia. See* Social Security Emergency Message (EM) 18003 REV 2, § B (available at: https://secure.ssa.gov/apps10/reference.nsf/links/08062018021025PM); Social Security Ruling 19-1p, 2019 WL 1324866 (S.S.A. Mar. 15, 2019).

As Judge Robert F. Kelly from the Eastern District of Pennsylvania noted, the agency most impacted by *Lucia* is the SSA. *See Marchant on behalf of A.A.H. v. Berryhill*, No. CV 18-0345, 2019 WL 2268982, at *2 (E.D. Pa. May 28, 2019) (multiple citations omitted). In the wake of *Lucia*, "courts have struggled to interpret what constitutes a 'timely challenge' during SSA proceedings." *Id.* at *2. The vast majority of courts have interpreted an Appointments Clause challenge to an ALJ in an SSA case to be "timely" if the challenge is raised during the administrative process. *See Bonilla-Bukhari v. Berryhill*, 357 F. Supp. 3d 341, 351 (S.D.N.Y. Mar. 4, 2019) (collecting cases). Conversely, there are a limited number of courts, led by the decision in *Bizarre v. Berryhill*, 364 F. Supp. 3d 418 (M.D. Pa. 2019), that have rejected the restrictive interpretation of *Lucia*, holding that an Appointments Clause challenge cannot be waived by

failing to raise it at the administrative level. *See Marchant*, 2019 WL 2268982, at *3 (collecting cases).

Directed by the Supreme Court's clear language in *Lucia*, this Court concludes that an Appointments Clause challenge may not be raised for the first time on appeal to the district court. Such a challenge must be raised at some point in the administrative proceedings. *See Lucia*, 138 S. Ct. at 2055 (stating "'one who makes a timely challenge to the constitutional validity of an officer who adjudicates his case' is entitled to relief."). In reaching this conclusion, this Court adopts the view of almost all of the courts to address the issue; indeed, this holding is in line with the decisions published in our Circuit thus far. *See, e.g., Nestor v. Comm'r of Soc. Sec.*, 19 CV 580 (BNC), 2019 WL 4888649, at *2-3 (E.D.N.Y. Oct. 3, 2019); *McMorris v. Comm'r of Soc. Sec.*, No. 6:18 CV 6118 (DB), 2019 WL 2897123, at *9-11 (W.D.N.Y. Jun. 26, 2019); *Johnson v. Berryhill*, No. 3:17 CV 1651 (VAB), 2019 WL 1430242, at *13-14 (D. Conn. Mar. 29, 2019); *Bonilla-Bukhari,* 357 F. Supp. 3d at 350 (noting that district courts within the Second Circuit have held that the failure to raise an issue with the ALJ waives judicial review, and acknowledging agreement with "the vast majority of courts that have considered this issue following *Lucia* and have concluded that exhaustion before the ALJ is required."); *Lobbe v. Berryhill*, 17 Civ. 5589 (HBP), 2019 WL 1274941, at *19-20 (S.D.N.Y. Mar. 20, 2019). Accordingly, the Court rejects the plaintiff's claim that this case must be remanded on this ground.

B.     DUTY TO DEVELOP THE RECORD

On appeal, this Court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citation & internal quotations omitted). The issue of whether

an ALJ has satisfied his obligation to develop the record is one that "must be addressed as a threshold issue." *Downes v. Colvin*, No. 14 CV 7147 (JLC), 2015 WL 4481088, at *12 (S.D.N.Y. July 22, 2015).

A "hearing on disability benefits is a non-adversarial proceeding," and as such, "the ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citation omitted). This duty exists even when, as in this case, the claimant is represented by counsel. *Id.* (citation omitted); *see also Burgess*, 537 F. 3d at 128. The regulations provide that the medical reports "'*should* include . . . [a] statement about what you can still do despite your impairment[.]'" *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013) (quoting 20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6) (emphasis added and alterations omitted)). [6] However, as the Second Circuit also acknowledges, "remand is not always required when an ALJ fails in his duty to request opinions, particularly where . . . the record contains sufficient evidence from which an ALJ can assess the [claimant's] residual functional capacity." *Tankisi*, 521 F. App'x at 34; *see also Downes*, 2015 WL 4481088, at *15 (holding that remand is not necessary when the record contains sufficient information from which the ALJ can assess a claimant's RFC, and when the record contains as assessment of a claimant's limitations from at least one treating physician), (citing *Tankisi*, 521 F. App'x at 34); *see Swiantek v. Comm'r Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015) (summary order) ("Although the Social Security regulations express a clear preference for evidence form the claimant's own treating physician

---

[6] *See also* 20 C.F.R. § 404.1520b (now providing that an ALJ may, but is not obligated to recontact a treating physician, and providing for such measures only when the existing record evidence is inconsistent or insufficient to make a disability determination); *see* 77 Fed. Reg 10, 651-01 (promulgating new regulations, effective March 26, 2012, amended 20 C.F.R. § 404.1512 to remove former subsection (e)). "While this amendment has given the ALJ greater flexibility in determining how to obtain additional information, it has not eliminated the ALJ's obligation to develop the record when additional information is needed due to the vagueness, incompleteness, or inconsistency of the treating source's opinion." *Moreau v. Berryhill*, No. 3:17 CV 396(JCH), 2018 WL 1316197, at *11 n.6 (D. Conn. Mar. 14, 2018) (multiple citations omitted).

over the opinion rendered by the consultative examiner . . . , this [c]ourt does not always treat the absence of a medical source statement from claimant's treating physicians as fatal to the ALJ's determination.").

As the Second Circuit has held, "it is not *per se* error for an ALJ to make a disability determination without having sought the opinion of the claimant's treating physician[.]" *Sanchez v. Colvin,* No. 13 CV 6303 (PAE), 2015 WL 736102, at *5 (S.D.N.Y. Feb. 20, 2015) (discussing how *Tankisi* reconciled seemingly competing directives in the SSA's regulations as to the need for seeking a treating physician's opinion) (citing *Tankisi*, 521 F. App'x at 33-34); *see also Pellam v. Astrue,* 508 F. App'x 87, 90 (2d Cir. 2013) (summary order). Moreover, remand is not necessary when there are no obvious gaps in the record precluding the ALJ from properly assessing the claimant's RFC. As the court explained in *Sanchez,* 2015 WL 736102, at *5, *Tankisi* held that the issue as to whether a treating physician's opinion is necessary "focuses on circumstances of the particular case, the comprehensiveness of the administrative record, and, at core, whether an ALJ could reach an informed decision based on the record[.]" *Id.*

The plaintiff argues that there are no records relating to the plaintiff's regular treatment sessions with Dr. Kiss at BH Care, and, in light of the ALJ's conclusion that the plaintiff's anxiety disorder was a "severe impairment[,]" (Tr. 24), such records were necessary to determine whether the plaintiff's anxiety imposed more than a minimal restriction on his ability to work. (Pl.'s Mem. at 6-7). The Court agrees that additional records would be helpful to determine whether the plaintiff's anxiety imposed more than a minimal restriction on his ability to work, but there is no evidence that such additional records exist or that there is a gap in the record that the ALJ had an obligation to fill.

This record reflects that the ALJ afforded the plaintiff's attorney multiple opportunities to submit additional evidence that would support his claim (*see* Tr. 210-11, 235, 269, 273-74, 296-97), and then attempted to subpoena evidence himself, to no avail. On May 16, 2016, three months prior to the first hearing, the ALJ specifically advised the plaintiff: "**If you are aware of or have more evidence, such as recent records, reports, or evaluations, you must inform me about it or give it to me no later than 5 business days before the date of the hearing.**" (Tr. 210 (emphasis in original); *see also* Tr. 273-74, 296-97 (June 26 and July 21, 2017 notices with the same notice)). As the ALJ recited in his decision, at the 2016 hearing, the plaintiff's counsel informed the ALJ that six months' worth of medical records were missing from BH Care, and that he had written to the provider to request additional updated information. (Tr. 21; *see* Tr. 105-06). The ALJ left the record open for an additional 30 days (*see* Tr. 106), but as of September 15, 2016, none were received. (Tr. 21). On September 15, 2016, the ALJ sent a letter to plaintiff's counsel informing him as follows:

> I held the record open subsequent to the hearing . . . so that you could submit additional evidence. You neither submitted such evidence nor sent a request for more time.
>
> If you do not send the evidence, request additional time, or satisfactorily explain why you cannot submit the requested evidence, within 10 days of the date of this letter, I will make my decision based on the available evidence.

(Tr. 415).

The ALJ attempted then to "obtain these records in a request sent to BH Care in November 2016." (Tr. 21; see Tr. 416-17). "Having received no reply, the [ALJ] issued a subpoena," but, as of the date of the decision, no records were sent. (Tr. 21; see Tr. 263-66). The plaintiff argues that the time period sought in the subpoena was not sufficiently broad because the ALJ only requested records from March 1, 2016 to the present. This is not, however, a situation in which a limited

number of records were produced in response to the subpoena, thus suggesting that more records could exist and would have been produced if requested. BH Care did not respond to the subpoena, so **no** records—no records from March 1, 2016 to the present, or from any other dates— were submitted. Moreover, the record lacks support for the plaintiff's contention that more records exist.

The plaintiff testified at his hearing that he saw his "doctor when [he] [got] a chance, but [he had not] been able to keep up with some appointments because [he did] not have a vehicle[,]" and, although he had not seen any doctors for his leg and ankle pain in the prior year and a half, he had seen his therapist, Dr. Kiss, "maybe twice a month or whenever [he could] get an appointment." (Tr. 81-82). Thus, it is far from clear, based on the plaintiff's own testimony, that there are additional treatment records. Additionally, the records from Dr. Kiss do not suggest that other records exist.

The first record from Dr. Kiss is dated March 24, 2015, when he performed a mental health clinical assessment of the plaintiff.[7] (Tr. 575-81). At that time, the plaintiff reported feeling depressed and anxious, with "anxiety attacks out of the blue." (Tr. 575). He had a prescription for Ativan, and he reported taking that for the previous year. (Tr. 575). The plaintiff reported that he avoided "things that may trigger a panic attack, such as confined areas and crowds of people." (Tr. 575). He reported graduating high school, but "in a special needs program." (Tr. 579). He denied a history of substance abuse or drug treatment. (Tr. 576, 579). Dr. Kiss assessed the plaintiff with Axis I diagnoses of Major Depressive Disorder, Recurrent, Moderate, and Panic Disorder. (Tr. 580). A psychiatric evaluation was scheduled nearly six months later, in September 2015. (Tr. 580).

---

[7] Two weeks prior, the plaintiff went to the emergency room at Griffin Hospital for complaints of nausea and left arm soreness. (Tr. 584-602). The diagnosis was a panic attack. (Tr. 589).

On May 27, 2015, the plaintiff presented to Cornell Scott-Hill Health Center Behavioral Health for a Mental Health/Substance Abuse Evaluation as a "self-referr[al] for opiate detox." (Tr. 682; *see* Tr. 682-755). The plaintiff reported using six-to-eight bags of heroin daily by inhalation, and a history of using unprescribed Percocet for his chronic leg pain. (Tr. 682, 684, 694). Additionally, "[a]ccording to [the] triage note, withdrawal symptoms reported included nervousness, pupil dilation, nausea, and restlessness." (Tr. 682). The plaintiff reported that he began using heroin and Percocet at age 37 (*i.e.*, at some point after March 25, 2014). (Tr. 682). He also reported a history of depression with no prescribed medication, and generally feeling "just sad." (Tr. 691, 694). He was discharged from the program four days later, on May 30, 2015, after two appointments. (Tr. 693).

As scheduled back in March 2015, on September 9, 2015, the plaintiff underwent an Initial Psychiatric Evaluation at BH Care. (Tr. 757-63). The plaintiff reported that he had "bad depression[,]" decreased focus, "bad anxiety," anhedonia, low energy, no motivation, reduced ability to retain information, decreased sleep, feelings of hopelessness, worthlessness and guilt, mood swings, racing thoughts at times, impulsivity, and, "social anxiety —can't date." (Tr. 757). He reported that he graduated high school, but received special education for a learning disability, and when he was 22, while working as a bouncer at a bar, he was in a fight and received court-ordered anger therapy. (Tr. 757). He was well groomed, his judgment was intact, his thought content was normal and appropriate, his thought process was racing, he was oriented, but did not know the date, his attention and concentration were impaired "always[,]" and he was anxious. (Tr. 759). He was taking Cymbalta and Clonidine, and his diagnoses were major depressive disorder, panic disorder, rule out social anxiety, childhood diagnosis of attention deficit disorder ["ADD"], and learning disability, not otherwise specified. (Tr. 760). The clinician noted that the plaintiff

had the "recent stressors of construction job loss [and] inability to retrain for computer or desk work [due to] [decreased] cognition/retention of infor[mation] [and] ADD [symptoms], impairment to walking [with] fused [left] ankle (spontaneous, <u>not</u> surgical)." (Tr. 760 (emphasis in original)).

The plaintiff was seen for medication management at BH Care on September 20, 2015 (Tr. 764) and February 29, 2016 (Tr. 770). There is no reason to believe there are missing treatment records from this six-month period, which plaintiff's counsel addressed at the hearing, in light of the February 29, 2016 record in which the provider noted that the plaintiff "has not been seen since Sept. [2015]," and the plaintiff was advised to "keep BH Care appts (appointments)." (Tr. 770).

Moreover, a review of the treatment records from Griffin Faculty Practice Plan, Inc. ["Griffin Faculty Practice"] do not suggest there are gaps in the record. The first treatment record from Griffin Faculty Practice is dated January 15, 2015, when the plaintiff was seen by Dr. Shyla Muriel for fainting spells and left ankle pain radiating to his hip. (Tr. 547-50; *see also* Tr. 656-57). Prior to that appointment, the plaintiff was seen at the emergency room on September 21, December 1 and December 25, 2014 for light headedness, shortness of breath, nausea and left arm pain. (Tr. 471-94, 495-543; *see* Tr. 558 (On December 1, 2014, the plaintiff noted that he took "2 Percocet tabs for his dental.")). A cardiac cause was ruled out, and on December 25, 2014, the diagnosis was "generalized anxiety disorder." (Tr. 543; *see also* Tr. 437 (clinical impression "lightheadness" and "anxiety [Not Otherwise Specified]")). Thus, when the plaintiff was seen by Dr. Muriel, she evaluated him in light of this history. Dr. Muriel noted that the plaintiff had a "left foot deformity and ha[d] abnormal limping gait, for which he had to compensate." (Tr. 547). On examination, the plaintiff was obese and had limited ambulation. (Tr. 548). Dr. Muriel opined that the plaintiff's heart palpitations were "most likely anxiety induced[] PVC's [Premature Ventricular

Contractions]." (Tr. 549). She referred the plaintiff for physical therapy and for a podiatry consult. (Tr. 549; *see* Tr. 544, 573-74l; *see also* Tr. 766-68 (podiatry records)).

The plaintiff argues that the references in that record to the plaintiff's complaints "last reviewed 9/15/2014" suggests that "records from prior to 1/15/15 may reasonably be expected to exist." (Pl.'s Mem. at 6 n.17). The plaintiff's treatment records with Dr. Muriel, and at Griffin Faculty Practice, however, do not reflect specialized treatment for this ankle impairment which might suggest earlier treatment records reflecting the same. The plaintiff was seen by Dr. Muriel again on May 7, 2015 (R. 659-661) for cough-and-cold symptoms. (Tr. 659-61), and a week later, he was seen at the Griffin Faculty Practice for gastrointestinal conditions. (Tr. 662-64, 671; *see* Tr. 676-80). There is no reason to believe that there are additional records and that such records relate to the plaintiff's left ankle or leg condition. This conclusion is supported further by the plaintiff's testimony at his 2016 hearing that he had not seen a doctor for his left ankle or leg in approximately a year and a half (which would have been February 2015) (Tr. 81-82), and when asked at the hearing if there were additional records missing, the plaintiff did not speculate that these earlier records that he now references were missing. The ALJ does not have a duty to secure records based on an unarticulated speculation and no evidence of a gap in the record.

Ultimately, after the ALJ's decision, the plaintiff did secure additional records from Dr. Muriel, but all of these records were from 2016 and 2017 and were considered by the Appeals Council. (*See* Tr. 108-40). Additionally, the defendant is correct that, to the extent that the plaintiff claims his left ankle condition "worsened over time" (Tr. 46-47; *see* Tr. 429 (October 2013 report that the plaintiff had the ankle pain for 20 years but it had worsened in the previous 8 years); Tr. 431 (as of October 7, 2013, the plaintiff "clearly needs surgical intervention" but the plaintiff elected not to undergo surgery due to the risks)), the 2016 and 2017 records would be most

pertinent. These records, however, do not demonstrate a worsening of his condition, but rather, evidence primary care for a rash (Tr. 128-30) and medical care for diabetes, hypertension and obesity. (Tr. 109-27, 131-34).

B. <u>THE ALJ PROPERLY ASSESSED THE PLAINTIFF'S COMPLAINTS OF PAIN AND SUBSTANTIAL EVIDENCE SUPPORTS THE RFC FINDING</u>

Cumulatively, the records before the ALJ, and the testimony from the plaintiff, support the ALJ's RFC assessment. The ALJ concluded that the plaintiff's anxiety was a severe impairment, but it did not meet listing 12.06 as the plaintiff had only a mild limitation in understanding, remembering or applying information, a moderate limitation in interacting with others, a mild limitation in concentrating, persisting or maintaining pace, and, a mild limitation in adapting or managing oneself. (Tr. 25-26). As the ALJ noted in his decision, upon testing by F. Scott Winstanley, Ph.D., the plaintiff's overall intelligence was low average range, and his working memory was in the average range. (Tr. 25, *See* Tr. 773).[8] The ALJ found that the plaintiff had moderate limitations in interacting with others, in that the plaintiff testified that he avoided crowds, areas with noise, and the grocery store due to his anxiety. (Tr. 25; *see* Tr. 525). The record also reflects that the plaintiff reported to Dr. Kiss that he had "excellent friends and [he was] getting more than enough social support[]" (Tr. 579), and, although the plaintiff had a depressed mood, his affect was "bright" and he was seen "joking [with] peers in [the] waiting room[]" at BH Care. (Tr. 764). The ALJ considered the plaintiff's hobby of putting together model cars before concluding that the plaintiff had mild limitations in concentrating, persistence or maintaining pace

---

[8] In addition to the mental health treatment records discussed above, the ALJ had the benefit of a psychological report from the consultative examination with Dr. Winstanley on October 11, 2014. (Tr. 771-82). The plaintiff reported to Dr. Winstanley that he had a "longstanding history of anxiety and panic attacks which can be very debilitating[,]" and that his "last panic attack was yesterday[,]" but he "refuse[d] to go to outpatient psychotherapy, as he stated it does not help." (Tr. 771). He denied a history of substance abuse. (Tr. 771). He reported that he was unable to work because of the "bone collusion in his left an[k]le which can interfere with his ability to perform physical labor jobs, and, because he has anxiety with frequent panic attacks, and learning problems that began as a child." (Tr. 771-72).

(Tr. 25). Additionally, the ALJ noted appropriately the plaintiff's self-referral to the opiate detox program as evidence of his ability to manage himself (Tr. 26), and the plaintiff testified that he was able to cook, clean, care for his personal hygiene and do laundry. (Tr. 86-87).

Moreover, there are other medical records relating to the plaintiff's foot and leg pain that the ALJ considered, which support the ALJ's RFC determination that the plaintiff could perform sedentary work with limitations. (Tr. 26-29; *see* Tr. 428-35, 574). Treatment records from Dr. William Cimino in October 2013 revealed reduced range of motion "in all planes[,]" difficulty walking, and a "complex pathology" that would require surgery, but the plaintiff "decided to defer surgical intervention." (Tr. 430, 433-34). Additionally, the ALJ had the benefit of a consultative examination by Dr. Joseph Guarnaccia and APRN Patricia Garrett. (Tr. 450-55). Consistent with Dr. Cimino's findings, the consultative examiners concluded that the plaintiff had decreased range of motion and pain in his cervical and lumbar spine areas, both shoulders, both hips, both knees, and the left ankle and foot. (Tr. 453). He tested positive for bilateral carpal tunnel syndrome, and he had 0/5 muscle strength in his left foot. (Tr. 453). He was described as "obese and slow moving[,]" and he had "difficulty with position changes and donning and doffing footwear." (Tr. 451). He had limitations in bending because of low back pain. (Tr. 453). The plaintiff, however, testified at the 2016 hearing that he had not sought treatment or seen a doctor for his ankle or leg impairment in approximately 18 months, due to a lack of transportation, even though he was able to get to appointments for his mental health care. (Tr. 81-82).

The consultative examination from Dr. Guarnaccia and APRN Garrett reflects that the plaintiff had "weak" grip strength and "pain[] bilaterally[,]" and that he tested "positive bilaterally for carpal tunnel syndrome." (Tr. 452). He testified that he built model cars but would only work on them for one or two hours before he would get a "massive headache" and numbness in his

hands. (Tr. 56-57, 94). The plaintiff, however, was able to cook, clean, care for his personal hygiene, do laundry, perform some yard work, grocery shop, and drive. (Tr. 86-87). Moreover, the plaintiff did not seek treatment for carpal tunnel, but rather accepted the condition as something that is "just . . . always going to be there." (Tr. 94). Accordingly, the ALJ did not err in failing to include this limitation in his RFC.

D.    STEP FIVE ANALYSIS

The plaintiff argues that the ALJ's step five findings were unsupported as the ALJ did not reference the vocational expert's testimony from the first hearing or account for the fact that it was based on a different hypothetical posed by the ALJ. (Pl.'s Mem. at 10-11). Additionally, the vocational experts identified vastly different numbers of jobs available for the job of a Surveillance System Monitor (3,000 identified by Calandra versus 130,000 identified by Hall). (Tr. 104 and 62).

At the first hearing, held on August 10, 2016, the vocational expert, Edmond Calandra, described the plaintiff's past work as a jackhammer operator as heavy and unskilled work; his work as a salvage yard man as medium and unskilled work; and his work as a warehouse worker as medium and unskilled work. (Tr. 102).

The ALJ then posed two hypotheticals. (Tr. 103-04). In the first hypothetical, the individual was limited to sedentary level exertion, and unable to consistently stay on task for more than eighty percent of the time in the work place. (Tr. 103). The vocational expert testified that such an individual would be unable to perform the plaintiff's past work and unable to perform any other work. (Tr. 103). In the second hypothetical, the individual was limited to sedentary level exertion, could not use left or right foot controls, could occasionally balance, bend, crawl, twist, squat, kneel and climb, but could not climb ropes, ladders or scaffolds, and was capable of

repetitious, routine simple work that did not require team work or did not require working closely the public. (Tr. 1003-04). The vocational expert testified that, based on that second hypothetical, the individual could perform the work of a Jewelry Painter, with 5,600 jobs nationally and 75 in Connecticut; a Jewelry Stringer, with 5,000 jobs nationally and 75 in Connecticut; and, a Security Surveillance Monitor, with 3,000 jobs nationally and 100 in Connecticut. (Tr. 104). If such an individual was limited further by less than frequent reaching, handling and fingering, such an individual could not perform the work of a Jewelry Painter or Jewelry Stringer. (Tr. 105).

At the second hearing, the vocational expert, Richard Barry Hall, testified that the plaintiff's past relevant work as a salvage handler and warehouse worker were classified as "material handler" work which is classified as medium exertion work by the DOT, with one of the jobs performed at the medium level and one performed at the very heavy level, which would be a deviation from the DOT description. (Tr. 60). The jackhammer operator job was classified as a "general laborer[,]" which is described in the DOT as medium exertion level work, but which was performed at the heavy level. (Tr. 60). The vocational expert testified that a person limited to sedentary exertional level who is unable to complete tasks from beginning to end on a consistent competitive basis in the workplace due to various physical and mental limitations would be precluded from the plaintiff's past work as found in the DOT, and there would not be other work available. (Tr. 61). He then testified, in response to a second hypothetical, that an individual who was limited to sedentary exertion level work, capable of performing simple, routine, and repetitious work that does not require teamwork or working closely with the public, and involves occasional interaction with co-workers, the public and supervisors, and occasional bending, balancing, twisting, squatting, kneeling, crawling and climbing, but no climbing of ropes, ladders and scaffolds, and no left foot controls, could not perform the plaintiff's past relevant work, but

could perform other work. (Tr. 61-62). Specifically, he testified that such a person could perform the work of a monitor, with 130,000 jobs nationally and 1,200 jobs regionally; a document preparer, with 115,000 jobs nationally and 1,100 jobs regionally; and, an addresser, with 120,000 jobs nationally, and 1,100 jobs regionally. (Tr. 62). If reaching, handling and fingering were limited to occasional, all of those jobs would be precluded. (Tr. 64).

"At Step Five, the Commissioner must determine that significant numbers of jobs exist in the national economy that the claimant can perform." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (citing 20 C.F.R. §§ 404.1560(a)(4)(v), 416.920(a)(4)(v)). "An ALJ may make this determination either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert." *Id*. The plaintiff argues that there was no limitation to account for the plaintiff's frequent need for urination, resulting in him being off-task ten percent of the work day, and that there was no limitation to occasional reaching, handling and fingering, to account for his bilateral carpal tunnel syndrome. As discussed above, however, the ALJ's RFC determination is supported by substantial evidence in the record. "An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as there is substantial record evidence to support the assumptions upon which the vocational expert based his opinion . . . and accurately reflect the limitations and capabilities of the claimant involved[.]" *Id.* (citations & internal quotations omitted). Thus, in light of the conclusion reached above, the ALJ did not err by failing to include these additional limitations.

Next, the plaintiff argues that the vocational expert failed to identify a significant number of jobs that the plaintiff could perform, and the differences in the hypotheticals posed to the two vocational experts resulted in significantly different job incidence numbers[9] that could not be

---

[9] The plaintiff argues that the "only plausible explanation for Hall's appearance at the second hearing is that, after the first hearing, the ALJ came to the realization that Calandra's testimony was insufficient to meet the Commissioner's

supported.[10]  "Neither the Social Security Act, nor the Commissioner's Regulations or Rulings provide a definition for a 'significant' number of jobs." *Koutrakos v. Colvin*, No. 3:13 CV 1290 (JGM), 2015 WL 1190100, at *21 (D. Conn. Mar. 16, 2016).  Thus, courts are "generally guided by numbers that have been found 'significant' in other cases[,]" *Hamilton v. Comm'r of Soc. Sec.*, 105 F. Supp. 3d 223, 230 (N.D.N.Y. May 13, 2015) (citation omitted), and courts within the Second Circuit "have generally found that what constitutes a 'significant' number [of jobs] is fairly minimal." *Rodriguez v. Astrue*, No. 11 Civ. 6977 (PAC) (DF), 2013 WL 3753411, at *3 (S.D.N.Y. July 17, 2013); *Hanson v. Comm'r of Soc. Sec.*, No. 15 CV 0150 (GTS/WBC), 2016 WL 3960486, at *13 (N.D.N.Y. Jun. 29, 2016) (numbers from 9,000 upwards constitute "significant"), *report and recommendation adopted sub. nom. Hanson v. Colvin*, 3:15 CV 150 (GTS/WBC), 2016 WL 3951150 (N.D.N.Y. Jul. 20, 2016). Thus, in this case, the total number of jobs identified by the first vocational expert, 13,600 (Tr. 104), could constitute a significant number of jobs.  *See Sena v. Berryhill*, No. 3:17 CV 912 (MPS), 2018 WL 3854771, at *15 (D. Conn. Aug. 14, 2018) (noting that although the plaintiff challenged the "significance of 10,000 touch-up screener positions nationally, none of the cases he cites supports this challenge, and the case law in general appears to refute it.").

---

burden at Step Five to show a significant number of jobs exist in the national economy[.]" (Pl.'s Mem. at 10).  The plaintiff, however, was the one who requested a second hearing, upon invitation from the ALJ, after the ALJ received the report of Dr. Winstanley's consultative examination. *See* note 2 *supra*.

[10] In the hypothetical posed to vocational expert Hall, the ALJ changed the "no left or right foot controls," to "no left foot controls," and the ALJ changed the requirement of simple routine repetitive work "that does not require team work or does not require working closely with the public[,]" to simple routine repetitive work "that does not require team work or does not require working closely with the public" *and* includes "occasional interaction with co-workers, the public, and supervisors." (Tr. 61-62). The ALJ's RFC limits the plaintiff to "no left foot controls" and both "simple, routine, repetitious work tasks that do not require teamwork or working closely with the public" and "occasional interaction with the public, co-workers, or supervisors[.]" (Tr. 26). Under both hypotheticals, each vocational expert identified Surveillance System Monitor, but Calandra testified that there were 3,000 jobs in the national economy and Hall testified that there were 130,000 such jobs.  (*Compare* Tr. 104 and Tr. 62).

The plaintiff argues that the job incidence numbers identified by vocational expert Hall are not reliable in that he derived his numbers from "a Standard Occupational [Classification], [then found] the Occupational Employment Statistics number that corresponds[,]" and then used SkillTRAN and his professional experience to arrive at the number. (Tr. 67). SkillTRAN is a database that derives data from the Bureau of Census – Current Population Survey and Bureau of Labor Statistic – Occupational Employment Survey and National Long Term Employment Projections.   https://skilltran.com/index.php/support-area/documentation/223-jbp-defense   (last visited September 25, 2019). SkillTRAN "has examined each of the 12,761 DOT occupations and related government occupational codes and cross-references to assign one or more NAICS [North American Industry Classification System] industry codes to each DOT to indicate which NAICS industries are the most like places for that DOT to be employed." *Id.*   Job Browser Pro is commercial software produced and marketed by SkillTRAN; it "acts like a spreadsheet template to perform appropriate simple calculations based on a selected DOT occupation." *Id.*  The plaintiff argues that a cross-reference of the vocational expert's testimony with the Job Browser Pro estimates reveals that the vocational expert "could not possibly have relied on Job Browser Pro for his job incidence numbers," but instead, must have conjured the numbers from his "association and experience." (Pl.'s Mem. at 14-15). Specifically, the plaintiff asserts that the total employment for the Standard Occupational Classification ["SOC"] covering surveillance system monitor (SOC 33-9099 "All Other Protective Service Workers") is 135,120 for the five occupations that fall within the classification, whereas, for 2016, Job Browser Pro estimates a national job incidence of 6,698 for the DOT code for just surveillance system monitor.  (Pl.'s Mem. at 14).  Additionally, for the job of addresser, the total employment for the SOC for the seven occupations, which include addressers (SOC 43-9022 "Word Processors and Typists") is 67,230, but, for 2016, the Job Brower

Pro estimates national job incidence for 4,744 for the DOT code just for an addresser. Thus, according to the plaintiff, Hall's testimony that there are 130,000 national jobs for surveillance system monitors, and 120,000 national jobs for addressers is not supported by substantial evidence. (Pl.'s Mem. at 15).

"An ALJ does not err when he relies on a vocational expert's testimony that is based on personal experience, labor market surveys, and published statistical sources in determining the number of jobs available." *Saad v. Berryhill*, No. 3:17 CV 2000 (KAD), 2019 WL 1429541, at *3 (D. Conn. Mar. 30, 2019) (citing *Jones-Reid v. Astrue*, 934 F. Supp. 2d 381, 407 (D. Conn. 2012), *aff'd*, 515 F. App'x. 32 (2d Cir. 2013) (summary order)). Moreover, the vocational expert need only identify "'the sources he generally consulted to determine'" the availability of jobs, even if he does not provide "specific information." *Id.* (quoting *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 450 (2d Cir. 2012) (citing *Galiotti v. Astrue*, 266 F. App'x. 66 (2d Cir. 2008) (summary order)); *see also McIntyre*, 758 F.3d at 152 ("[A] vocational expert is not required to identify with specificity the figures or sources supporting his conclusion, at least where he identified the sources generally."). This approach is rooted in the "extremely flexible" nature of the "substantial evidence" standard which "gives federal courts the freedom to take a case-specific, comprehensive view of the administrative proceedings, weighing all the evidence to determine whether it was "substantial."" *Brault*, 683 F.3d at 450.

While the Court is sensitive to the plaintiff's concern about the vague nature of Hall's testimony regarding his methodology in arriving at the job incidence numbers for the positions he identified, the Court cannot conclude that the ALJ erred in his conclusion at Step Five. To date, the Second Circuit does not require a detailed scrutiny of a vocational expert's methods. *See Lillis v. Colvin*, No. 3:16-CV-269 (WIG), 2017 WL 784949, at *5 (D. Conn. Mar. 1, 2017) (citing *Brault*,

683 F.3d at 449-50 (employing a substantial evidence standard for evaluating a VE's testimony rather than a more stringent *Daubert* rule)); *Galiotti*, 266 F. App'x. at 68 (explaining that when a VE identifies the sources he generally consulted to determine the number of jobs available, he is not required to "identify with greater specificity the source of his figures or to provide supporting documentation."); *Jones-Reid*, 934 F. Supp. 2d at 407 (finding that when a VE "utilized reliable statistical sources as well as personal knowledge and experience to develop the occupational projections provided," a "step-by-step description of the methodology used" was not required); *Henry v. Colvin*, No. 12-CV-6822 (KBF), 2015 WL 9238959, at *7 (S.D.N.Y. Dec. 17, 2015) (expressing concern about reliance on the Dictionary of Occupational Titles since it was published over twenty-five years ago, and about actual availability of some of the jobs the VE proposed, but noting that "the Dictionary is nevertheless an accepted basis for vocational opinion according to the Commissioner's rules."); *Healy v. Colvin*, No. 3:15-CV-01579 (JAM), 2016 WL 4581403, at *7 (D. Conn. Sept. 2, 2016) (finding that when claimant could not show the VE's estimates were factually incorrect, "[t]he failure of the vocational error to cite a source for his estimate does not constitute error.")). An identification of the general sources and consideration of the experience and expertise of the vocational expert suffices; the ALJ need not inquire into the vocational expert's precise methodology. *See Bradley v. Berryhill*, No. 3:16 CV 1478 (JAM), 2017 WL 3314000, at *3-4 (D. Conn. Aug. 3, 2017) (holding that the ALJ "gave the [vocational expert's] testimony the scrutiny that the law requires[]" by asking what sources were relied on, and considering the vocational expert's expertise).

In *Bradley*, the vocational expert arrived at job incidence numbers by using his expertise and knowledge, as well as resources such as Job Brower Pro. *Id.* at *3. In striking similarity to this case, the plaintiff argued that the ALJ erred by failing adequately to scrutinize the vocational

expert's methodology in light of the fact that the vocational expert's numbers were "implausibly high." *Id.* The Court rejected the plaintiff's argument, holding that the ALJ "gave the [vocational expert's] testimony the scrutiny that the law requires[,]" which is to ask the vocational expert to identify the sources he used to reach his opinion, and to consider the vocational expert's expertise in the field of vocational studies. *Id.*; *see also Diaz v. Berryhill*, No. 3:17 CV 735 (JCH), 2018 WL 4462366, at *9 (D. Conn. Sept. 18, 2018) (finding no error at step five even when the vocational expert, relying on SkillTRAN and Job Browser Pro, "may not have provided the clearest description of the individual steps" of the vocational expert's methodology); *see Blake v. Colvin*, No. 2:14 CV 52 (JMC), 2015 WL 3454736, at *8-9 (D. Vt. May 29, 2015) (holding that there was no error at step five when the vocational expert, who had "extensive experience in the field of vocational assessment[,]" identified Job Brower Pro as the source he relied on in determining the job numbers, corroborated the numbers by his own vocational research, and submitted to a full cross-examination regarding the source).

Moreover, even if the numbers identified by Hall are reduced to the number of jobs identified by the plaintiff for just the monitor and addresser jobs—namely, 6,698 jobs nationally for a surveillance system monitor, and 4,744 jobs nationally for an addresser– there would still be 11,442 jobs identified, which, as discussed above, is a "significant" number of jobs in the national economy. (*See* Pl.'s Mem. at 14). Accordingly, the ALJ did not err at Step Five.

VI.   CONCLUSION

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 14) is *denied*, and the defendant's Motion to Affirm (Doc. No. 18) is *granted*.

This is not a recommended ruling. The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure. Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. § 636(c)(3); FED. R. CIV. P. 73(c).

Dated this 25th day of October, 2019 at New Haven, Connecticut.

<u>  /s/Robert M. Spector, USMJ</u>
Robert M. Spector
United States Magistrate Judge